FILED
2012 Jun-11 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **BELINDA G. REEVES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:09-CV-1685-VEH** |
| | ) |
| **COOSA VALLEY YOUTH** | ) |
| **SERVICES,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Belinda G. Reeves ("Ms. Reeves") initiated this job discrimination lawsuit arising under 42 U.S.C. § 1981 by and through § 1983 against Defendant Calhoun County Board of Education (the "BOE") on August 21, 2009.  (Doc. 1).  Defendant Coosa Valley Youth Services ("CVYS") was subsequently substituted for the BOE on October 1, 2009.  (Doc. 9).  Pending before the court is CVYS Motion for Summary Judgment (Doc. 60) (the "Motion") filed on March 31, 2011.  CVYS filed all of its supporting materials on this same date.  (Docs. 61-67).

Ms. Reeves filed her opposition brief (Doc. 68) and evidence (Doc. 69) to the Motion on April 21, 2011.  On May 2, 2011, the CVYS followed with its reply.

(Doc. 70).

On September 20, 2011, the court entered a memorandum opinion (Doc. 72) and separate order (Doc. 73), which granted the Motion with respect to Ms. Reeves's "claims for back pay, front pay/job reinstatement, and punitive damages[.]" (Doc. 11 at 1). The court deferred deciding the rest of the Motion and also ordered Ms. Reeves to show cause as to what remedial portions of her lawsuit remained pending. (*Id.*).

On September 30, 2011, Ms. Reeves responded that she should be "allow[ed] . . . to pursue her claims for injunctive relief [presumably, other than in the form of job reinstatement], attorneys' fees, costs, and mental anguish damages." (Doc. 74 at 3). In light of Ms. Reeves's response to the show cause order, the court now addresses the remainder of CVYS' Motion, and, for the reasons explained below, it is **DENIED**.

## II.    FACTUAL BACKGROUND

CVYS is a public corporation/governmental entity that serves as a regional child detention center.[1]  Ms. Reeves is an African-American/black female who was

---

[1]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*,

formerly employed by CVYS as a full-time cook.  Ms. Reeves employment with CVYS began on October 1, 1990, and ended on or about August 21, 2005.

Mike Rollins ("Mr. Rollins") is a Caucasian/white male, who served as the Executive Director of CVYS when Ms. Reeves was discharged.  The parties are in agreement that Mr. Rollins was the sole supervisor involved in the decision to fire Ms. Reeves.  According to his deposition testimony, Mr. Rollins terminated Ms. Reeves's employment on August 21, 2005, due to her failure to complete certain paperwork, combined with her previous disciplinary history.  (*See* Doc. 63 at Ex. I at 22 ("I did fire Ms. Reeves and informed her that the termination was based upon the violations of the documentation in the food service area that she had previously had disciplinary action for."); *id.* at 67-68 ("Her termination was based upon the fact that she had had prior disciplinary actions for the problems that reared themselves again in August of 2005, which had to do with documentation of the commodity and then the Food Bank commodity inventories, the temperature check sheets, the menu change sheets, and posting those menu changes.")).

_____

487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

## III.   STANDARD

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.   Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme

4

Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's

---

[2] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989). Based upon this standard and in the absence of a record of any invidiously-charged utterances, Ms. Reeve's case is purely a circumstantial evidence one. (*See also* Doc. 68 at 26 ("Both parties agree that there is no direct evidence of discrimination here.")).

legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## IV.   ANALYSIS

### A.   Eleventh Amendment Immunity

Earlier in this litigation, the court rejected CVYS' Eleventh Amendment defense based in part upon the underdeveloped nature of the record. (*See* Doc. 39 at 9-10 (identifying holes in presenting state immunity defense as motion for judgment on pleadings)).  CVYS has raised state sovereign immunity again as part of its Motion.  Therefore, this court revisits the issue.

> "The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." *Lassiter v. Alabama A & M University*, 3 F.3d 1482, 1485 (11th Cir. 1993). "Congress has not abrogated Eleventh Amendment immunity in section 1983 cases." *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525 (11th Cir.1990). Alabama has not waived its immunity. *E.g. Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057–58, 57 L. Ed. 2d 1114 (1978).

*Cross v. State of Ala., State Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1502 (11th Cir. 1995); *see also Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1069 (5th Cir. 1981) ("Unlike Title VII, Section 1981 contains no congressional

waiver of the state's eleventh amendment immunity.").[3]

In *Manders v. Lee*, the Eleventh Circuit summarized the framework for evaluating whether a defendant enjoys the benefit of state sovereign immunity:

> It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an "arm of the State" is sued. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). To receive Eleventh Amendment immunity, a defendant need not be labeled a "state officer" or "state official," but instead need only be acting as an "arm of the State," which includes agents and instrumentalities of the State. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997). Whether a defendant is an "arm of the State" must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. *See Shands Teaching Hosp. & Clinics v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."). The particular functions at issue are Sheriff Peterson's force policy at the jail and the training and disciplining of his deputies in that regard.

B. *Eleventh Amendment Factors*

In Eleventh Amendment cases, this Court uses four factors to determine whether an entity is an "arm of the State" in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm.*, 226 F.3d 1226, 1231-34 (11th Cir. 2000); *Shands*, 208 F.3d at 1311;

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Tuveson v. Fla. Governor's Council of Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir. 1984).

> Given these factors, the resolution of the Eleventh Amendment issue in this case depends, in part, on state law. Therefore, before applying the four-factor test, we must examine Georgia law and the relationship among Sheriff Peterson, the State, and Clinch County. The issue of whether an entity is an "arm of the State" for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law. Thus, we now journey through Georgia's legal terrain at some length.

*Manders*, 338 F.3d 1304, 1308-09 (11th Cir. 2003) (footnote omitted).

The Alabama Supreme Court does not appear to have ever addressed whether CVYS is an arm of the state.[4]  *Cf.  Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985) ("The Alabama Supreme Court has held on at least two occasions that state universities, including Troy State University, are agencies or instrumentalities of the state." (citing *Massler v. Troy State Univ.*, 343 So. 2d 1 (Ala. 1977))).  Accordingly, it is appropriate for this court to review the Alabama Code for clues about how to classify CVYS.  In this regard, the court has found several provisions which shed

---

[4]  For the reasons previously explained in denying CVYS' motion to dismiss, the court rejects the contention that *Carter v. Coosa Valley Youth Services*, 378 So. 2d 1145 (Ala. Civ. App. 1979) and *Coosa Valley Youth Services Corp. v. Etowah County*, 460 So. 2d 1232 (Ala. 1984), either explicitly or implicitly support CVYS' arm of the state argument in the context of the corporation's role as an employer. (*See* Doc. 39 at 3-8 (detailing why both decisions are unpersuasive on issue of sovereign immunity)).

light on the subject.

The Alabama statute under which CVYS is organized provides:

All counties and incorporated municipalities in this state are hereby authorized and empowered to form regional, nonprofit, public corporations which shall provide for the temporary care and custody of youths who have been placed under the jurisdiction of a juvenile court.

Ala. Code § 44-3-2.  Additionally, § 44-3-3 states:

Any corporation so created shall be a public, nonprofit corporation and may be organized as a successor to presently existing juvenile facilities and programs. Members in presently existing corporations shall automatically retain membership in any successor corporation formed after the passage of this chapter.

*Id.*

The service area is limited to those counties who are members of the public

corporation:

The service area of such corporation shall be those present and future Alabama counties who are members of a corporation formed for the purpose of providing temporary care and custody to those children who are placed with the corporation by order of a judge exercising juvenile court jurisdiction or otherwise placed under the authority of existing law.

Ala. Code § 44-3-4 (emphasis added).

The governance section states:

Such corporation shall be governed by a board of directors selected from member counties or municipalities, as the case may be, as may be specified in the bylaws of the corporation. The board of directors shall

hold regular quarterly meetings and such meetings as may be called from time to time by the chairman of the board who shall be selected in accordance with procedure as outlined in the bylaws. The annual meeting of the corporation shall be held in conjunction with the last board of directors meeting in the calendar year.

Ala. Code § 44-3-5.  Thus, the board's composition is tied to the "member counties or municipalities" as opposed to the state.

Regarding joining the membership of the governmental entity:

Any governing body in the state as defined in this chapter may submit a letter of application to the corporation's chairman of the board of directors.  Said letter shall be in compliance with admission procedures as established by the board.  Upon approval of a majority of board members present at a regularly scheduled board meeting, new members shall be admitted into the corporation and the number of directors representing that body will be determined by the existing board.

Ala. Code § 44-3-8.

In terms of funding:

All governing bodies, as defined in this chapter, are hereby authorized to appropriate and pay over to the corporation a respective share of the costs of operation of the facilities and programs of said corporation and the construction, renovation or operation of any future facility or programs as determined by the board of directors.

Ala. Code § 44-3-9.  Thus, funding is secured from the member bodies, and the board of directors determines the "respective share" attributable to each body.

Finally, the definition of "PROGRAMS" ties CVYS' standards to those provided by the Alabama Department of Youth Services (the "ADYS"):

10

> (6) Programs.  The use of various behavioral programs in the care and supervision of children. <u>All programs are to be in compliance with the minimum standards as established by the Alabama department of youth services as defined herein</u>.

Ala. Code § 44-3-1(6) (emphasis added).  However, a subsequent section regarding corporate responsibility makes it clear that the entity's board of directors is charged with making sure that those as well as other applicable state standards are met:

> Nothing in this chapter shall be construed to mean that the facilities and programs, provided for herein, are to be under the control or direction of any person other than the board of directors, who shall require the facilities and programs of the corporation to be in compliance with the minimum standards of construction, maintenance and operation adopted by state regulatory agencies and laws of the state of Alabama.

Ala. Code § 44-3-10.

Considering all these statutory sections, the court finds that Alabama law defines public corporations like CVYS with the overwhelming absence of any appreciable link to the state.  In fact, the only express connection to the state relates to CVYS' obligation to maintain standards consistent with those established by the ADYS and other state sources of law.  However, this connection to the state is tempered by the  recognition that the control and direction of CYVS belongs solely to its board of directors, and not to the state.

Also, the record lacks evidence that CVYS "is subject to substantial state control[.]" *Harden*, 760 F.2d at 1163.  For example, the record is devoid of any proof

11

that CVYS makes annual reports to the state legislature about its condition and its governing body is not composed of state officials and gubernatorial appointees.  *See* Ala. Code § 44-3-1(2) (defining "BOARD OF DIRECTORS" for regional custodial entities such as CVYS to mean "[t]hat body of persons selected in accordance with the articles of incorporation and bylaws of a corporation formed pursuant to this chapter"); Ala Code §  § 44-3-1(5) (defining "GOVERNING BODY" to mean "[a] county commission, board of revenue or other like governing body of a county, or the council, commission or other like governing body of an incorporated municipality"); *cf. Harden*, 760 F.2d at 1163 ("[I]ts Board of Trustees, which reports to the state legislature yearly on the condition of the University, is composed in part of state officials and in part of gubernatorial appointees." (citing Ala. Code §§ 16-56-1, 16-56-3)).  Therefore, *Manders* factors one and two favor finding against sovereign immunity.

Concerning *Manders* factor three, here, while CVYS apparently receives some appropriations from the state legislature through the ADYS, there is no indication that the entire budget of the CVYS is submitted for state approval.  *Cf.  Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985) ("Where the budget of an entity is submitted to the state for approval, this suggests that the entity is an agency of the state for purposes of the last two factors." (citing *Fouche v. Jekyll Island-State Park Authority*,

713 F.2d 1518, 1520 (11th Cir. 1983)).  Additionally, from a statutory standpoint, a significant portion of CVYS' funding comes from its members.  Ala. Code § 44-3-9. Therefore, consideration of the third factor neither strongly favors nor disfavors a finding of sovereign immunity.  Further, giving the divide in how CVYS receives its funds, this same conclusion of no clear leaning applies when evaluating *Manders* factor four.

Finally, consistent with Eleventh Circuit precedent, the court also considers the type of claim at issue in this case, *i.e.*, an employment one.  Because this function of CVYS is locally and/or regionally-driven without any indicia of state oversight, the court concludes that this additional factor favors a finding against sovereign immunity.  Therefore, balancing all of the foregoing, the court determines that CVYS is not an arm of the state for the purposes of this lawsuit and, therefore, is not entitled to a dismissal premised upon the defense of sovereign immunity.

### B.    Merits of Ms. Reeves's Discriminatory Discharge Claim

#### 1.    Preliminary Considerations

As a preliminary matter, the court is unclear to what extent Ms. Reeves  asserts that principles of collateral estoppel stemming from her unemployment compensation hearing play with respect to ruling on the remainder of CVYS' Motion.  (*Compare* Doc. 68 at 28 ("THE PARTIES AGREE THAT COLLATERAL ESTOPPEL IS NOT

AT ISSUE IN THIS CASE."), *with id.* ("Plaintiff believes that Defendant is collaterally estopped in this case.")). However, because the court decides the merits of her discriminatory discharge claim without relying upon collateral estoppel, it does address the parties' dispute (if one exists) over the application of this doctrine.

### 2. *Prima Facie* Case

As the Eleventh Circuit has articulated the *prima facie* discriminatory discharge standard "based on differential application of work or disciplinary rules[:]"

> We have consistently held that a plaintiff fired for misconduct makes out a *prima facie* case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained". The *prima facie* case is established even if the plaintiff's replacement is also a member of the protected class.

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (citations omitted). Ms. Reeves correctly observes that CVYS "does not contest that Plaintiff was a member of a protected class, black; that she was qualified to hold her position; or that she was subjected to an adverse employment action." (Doc. 68 at 30); (*see also* Doc. 61 at 34). Instead, "[t]he [sole *prima facie*] dispute between the parties is whether Plaintiff can identify similarly-situated employees outside of her protected class who received more favorable treatment." (Doc. 68 at 30).

14

Here, Ms. Reeves points to another kitchen worker, *i.e.*, Bradley Simmons ("Mr. Simmons"), who is white, as her comparator. (*Id.*). Reading the record in the light most favorable to Ms. Reeves, the court is persuaded that a reasonable jury could conclude that Mr. Rollins treated Mr. Simmons more favorably than Ms. Reeves, as Mr. Simmons, despite engaging in the same or even arguably worse than conduct than Ms. Reeves (*i.e.*, falsifying his time records which resulted in a suspension, committing a paperwork violation which was not separately disciplined, and subsequently engaging in multiple infractions during a single shift on September 7, 2007, which resulted in a write-up with a warning that the "next write-up will result in suspension from your job duties"). In particular, Mr. Simmons received the benefit of additional disciplinary warnings from Mr. Rollins and was not fired under CVYS' progressive discipline policy. Contrastingly, Ms. Reeves was discharged by Mr. Rollins because "[s]he had previously had written notice and suspension for the same problems" and "when it came up again, it was significant enough that it required termination." (Doc. 63 at Ex. I at 68). Thus, the court concludes that Ms. Reeves has adduced sufficient evidence to establish a *prima facie* case of discriminatory discharge.

### 3.    Pretext

The court similarly concludes, based upon comparator evidence, that Ms. Reeves has established adequate proof of pretext. *See MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (explaining that pretext is "evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions" (internal quotation marks omitted) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998))).

As the Supreme Court of the United States has clarified, in demonstrating pretext, a plaintiff may appropriately rely upon the same evidence used to support her *prima facie* case. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.10, 101 S. Ct. 1089, 1095 n.10, 67 L. Ed. 2d 207 (1981) ("In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case."); *id.* ("Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.").

Moreover, to show pretext, Ms. Reeves does not rely solely on the differing treatment between her and Mr. Simmons, but also provides several other examples

16

of situations in which Mr. Rollins decided to fire  black employees for work place violations while retaining white ones who engaged in the same or similar misconduct, *e.g.*, (i) Mr. Rollins fired a black kitchen employee named Charles Steele ("Mr. Steele") for time sheet irregularities and paperwork violations while he only disciplined Mr. Simmons for his falsification of time sheets, and did not punish him separately (much less discharge him) for the paperwork violations; and (ii) Mr. Rollins also fired another black kitchen employee, Gwen McClellan ("Ms. McClellan") for paperwork violations while he retained not only Mr. Simmons, but also a white employee, Lisa Harmon ("Ms. Harmon"), who Ms. Reeves had witnessed consuming alcohol on the job and subsequently reported such misconduct to Mr. Rollins.

Therefore, the record contains "evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions." *MacPherson*, 922 F.2d at 776 (internal quotation marks omitted) (quoting *Verbraeken*, 881 F.2d at 1045 (11th Cir. 1998)).  More particularly, as to pretext, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [CVYS'] proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776.  Alternatively, a reasonable jury could equally conclude that CVYS' articulated reasons for firing Ms. Reeves are

17

legitimate and not a pretext for race discrimination.

**V.      CONCLUSION**

Accordingly, for the reasons explained above, the remainder of the Motion is

**DENIED**.  An order setting this case for a final pretrial conference will follow.

**DONE** and **ORDERED** this the 11th day of June, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge